# UNITED STATES of America, Appellee,

### v.

## Terry Lee KUMMER, Appellant.

## No. 93–1904.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 14, 1993.

Decided Feb. 10, 1994.

Rehearing Denied March 17, 1994.

---

Counsel who presented argument on behalf of the appellant was Jonathan T. Garaas of Fargo, North Dakota.

Counsel who presented argument on behalf of the appellee was Keith M. Reisenauer, Assistant United States Attorney, Fargo, North Dakota.

Before MORRIS SHEPPARD ARNOLD, Circuit Judge, and HEANEY and ROSS, Senior Circuit Judges.

HEANEY, Senior Circuit Judge.

Terry Lee Kummer was initially convicted by a jury in North Dakota state court of possessing cocaine with intent to deliver. On appeal, the North Dakota Supreme Court overturned his conviction, finding that Kummer had been entrapped as a matter of state law. Kummer was subsequently charged in federal court. After his motions for dismissal and to suppress evidence were denied, Kummer pleaded guilty to violating 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Kummer preserved various legal issues for appeal, including his arguments that he was entrapped as a matter of law and that his conviction violates the double jeopardy clause of the Fifth Amendment. After a careful review of the record and the relevant, binding precedents, we affirm.

## BACKGROUND [1]

During the summer of 1990, law enforcement officers learned from two confidential informants that Kummer had been involved in drug trafficking. The informants had themselves been arrested for drug violations, and they agreed to cooperate with the officers in exchange for a favorable recommendation to the state's attorney's office on their

---

1. Pursuant to their plea agreement, Kummer and the government stipulated to the facts presented here. They repeat virtually verbatim the facts as they are presented in *State v. Kummer*, 481 N.W.2d 437 (N.D.1992), Kummer's state court appeal.

prosecutions. Special Agent Daniel Baumann of the State Bureau of Criminal Investigations and Officer Donn Weaver of the Fargo Police Department planned a "reverse sting,"[2] arranging for an informant to make a sale of drugs to Kummer.

On September 17, 1990, one of the informants, at the direction of Baumann and Weaver, made a taped telephone call from the police department to Kummer and asked him when he would be in the Fargo area to take advantage of a good deal on cocaine. Kummer expressed an interest, but only if the quality was better than it had been in the past. Four days later, the informant made another taped telephone call to Kummer and discussed the price and quantity of cocaine that Kummer might purchase. Kummer decided to purchase three ounces. Baumann and Weaver planned the amount of cocaine to offer to Kummer and set the price at $1,200 per ounce.

On September 28, the informant made two more taped telephone calls to Kummer to plan a date, time, and place for the sale. The informant and Kummer arranged to meet on the evening of September 30, 1990, at Motel 75 in Fargo.

On September 30, Weaver obtained three ounces of cocaine from the evidence room at the police department. He divided the cocaine into three one-ounce portions and heat-sealed each portion in plastic bags. Later that day, Baumann and the two informants went to one of two rented rooms at Motel 75. Baumann placed a body transmitter on one of the informants and instructed them to tell the front desk personnel to have Kummer, upon his arrival, call before coming to the room. When Kummer called, Baumann gave the three packages of cocaine to the informant who had arranged the transaction, turned on the body transmitter that had been placed on the other informant, and went to the other motel room where officers had set up surveillance equipment. When the officers heard the informants counting the $3,600 Kummer had given them, they went into the hallway and waited for Kummer to leave the room. Upon leaving the room, Kummer was stopped, a pat-down search was conducted, and the three packages of cocaine were retrieved. The money Kummer had given the informants was also retrieved.

Kummer was arrested and taken to the Fargo Police Department where he was charged with possession of a controlled substance with intent to deliver in violation of North Dakota Century Code §§ 19–03.1–07 and 19–03.1–23. Kummer waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and his right to be represented by counsel.

Officers Baumann and Weaver questioned Kummer for quite some time. When Kummer refused to answer their questions, Weaver told him that he was facing ten years in prison and a $10,000 fine. The officers told him that they could "help [him]," "make things easier for [him]," and "put in a good word for [him]." Affidavit of Terry Lee Kummer, at 1 (Nov. 9, 1992). Upon hearing these promises, Kummer told the officers of a "Joe South Dakota" (Joe Stack),[3] one of several individuals who was to receive the cocaine Kummer purchased in the reverse sting. He also told them of the circumstances surrounding the drug sale and the names of additional people who were to receive the cocaine. Baumann and Weaver then asked Kummer to deliver cocaine to Joe Stack at a prearranged place. When Kummer refused to do so, he was brought to jail. The next morning, Baumann again asked Kummer for his cooperation, and again promised to put in a good word for him.

---

**2.** In a reverse sting, rather than purchasing drugs, undercover police sell drugs to the target of the investigation.

**3.** Stack was subsequently approached by law enforcement officers and gave them the following statements which were the basis for subsequent federal charges brought against Kummer: during the month of May 1990, Kummer contacted Stack and discussed the sale of cocaine to Stack; on or about June 1, 1990, Kummer distributed approximately one-half ounce of cocaine to Stack; in approximately July or August 1990, Kummer distributed approximately one-half ounce of cocaine to Stack; and on or about September 30, 1990, Kummer was to meet Stack to distribute approximately one-half ounce of cocaine from the three ounces Kummer had received as a result of the "reverse sting." Appellant's Br. at 6–7.

Kummer refused to participate in the sale to Stack.

At trial, Kummer relied on a defense of entrapment on which the jury was properly instructed. The jury, however, rejected the entrapment defense and returned a verdict of guilty. Kummer appealed his conviction. The Supreme Court of North Dakota reversed Kummer's conviction and remanded the case for entry of a judgment of acquittal, finding that Kummer had been entrapped as a matter of state law because of the law enforcement officers' unlawful conduct. *See State v. Kummer,* 481 N.W.2d 437 (N.D. 1992).

Thereafter, the United States Attorney for the District of North Dakota sought and received approval to prosecute Kummer under the Justice Department's *"Petite* policy"[4] relating to successive state-federal prosecutions. Kummer was charged in a four-count indictment with possession of cocaine with intent to deliver, distribution, conspiracy, and aiding and abetting.

## DISCUSSION

### I. Entrapment

Kummer first argues that he was entrapped as a matter of law. He contends that our court should not countenance illicit conduct by law enforcement officials "by stamping an imprimatur of approval" upon conduct that was condemned by the North Dakota Supreme Court. Appellant's Br. at 9. Kummer would have us reject the federal standard applied in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), in which the Supreme Court upheld the applicability of the "subjective" standard of entrapment, which focuses

on an individual's predisposition to commit an offense, and instead adopt North Dakota's per se rule of entrapment, which focuses on the conduct of law enforcement officials (the "objective" approach). We are unable to do so because of prior decisions of the U.S. Supreme Court and this court.

In a case of first impression, the North Dakota Supreme Court held that Kummer was entrapped as a matter of state law because the police had to "create and commit a crime," *e.g.,* use unlawful means to obtain the drugs for sale to Kummer in violation of a state statute which provides that conduct by a public officer is not justified unless "required or authorized by law." *State v. Kummer,* 481 N.W.2d 437, 443 (N.D.1992); *see* N.D.C.C. § 12.1–05–02. Because there is "no statutory authority that authorizes a controlled substance confiscated in another drug prosecution to be withdrawn from evidentiary retention, offered for sale, and sold to others," the police, the court reasoned, used unlawful means to induce Kummer to commit the offense with which he was charged.[5] *Kummer,* 481 N.W.2d at 443. In finding entrapment as a matter of law, the court relied on North Dakota's entrapment statute,[6] which employs the objective test, "to determine whether police conduct is sufficiently unsavory to justify an entrapment defense." *Id.* (quoting *State v. Pfister,* 264 N.W.2d 694, 697 (N.D.1978)).

However appealing North Dakota's objective standard may be for public or other policy reasons, it is neither the standard adopted by the Supreme Court nor the standard guiding decisions involving entrapment law in this circuit. *See United States v. Russell,* 411 U.S. 423, 433, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *United States v.*

---

**4.** *See Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).

**5.** In addition to there being a lack of authority authorizing the officers' procurement of previously confiscated cocaine for use in the reverse sting, the court noted that under the Standard Operating Procedures of the Fargo Police Department, only "[a] court, prosecuting attorney, or a departmental policy can authorize the disposal of ... property." *Kummer,* 481 N.W.2d at 443. The court further noted that the operating procedures provide that "[n]arcotics, dangerous

drugs, and drug implements will be taken to the Toxicology Lab ... and destroyed in the presence of the property custodian or appropriate designee." *Id.*

**6.** Entrapment occurs "when a law enforcement agent induces the commission of an offense, using persuasion or other means likely to cause normally law-abiding persons to commit the offense. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment." N.D.C.C. § 12.1–05–11(2).

*King,* 803 F.2d 387, 390 (8th Cir.1986); *United States v. Lard,* 734 F.2d 1290, 1293 (8th Cir.1984). In order to demonstrate entrapment as a matter of law under the federal standard,

> the evidence must clearly have indicated that a government agent originated the criminal design; that the agent implanted in the mind of an innocent person the disposition to commit the offense; and that the defendant then committed the criminal act at the urging of the government agent.

*United States v. Shaw,* 570 F.2d 770, 772 (8th Cir.1978). The critical question, therefore, is whether the law enforcement officer caused or induced the defendant to commit a crime he or she was not otherwise *predisposed, e.g.,* willing and ready, to commit. *United States v. Richard,* 872 F.2d 253, 254 (8th Cir.1989). Determining a defendant's predisposition requires examination of the defendant's personal background to see "where he sits on the continuum between the naive first offender and the streetwise habitue."[7] *Lard,* 734 F.2d at 1293 (quoting *United States v. Townsend,* 555 F.2d 152, 155 n. 3 (7th Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977)). It also requires considering the extent to which the government agent instigated or induced the commission of the criminal act. *Id.*

The district court held that the reverse sting did not, of itself, constitute entrapment as a matter of law, and there is nothing in the record that would suggest otherwise. *See United States v. Kummer,* No. C3–92–67 (D.N.D. Dec. 18, 1992). Viewing the evidence in the light most favorable to the government, as we must,[8] we conclude that the evidence, particularly Kummer's apparent previous involvement in drug trafficking and his willingness to purchase the cocaine from the informants absent any prodding or inducement on the part of the police, is sufficient to support a finding that Kummer was not entrapped as a matter of law.

■ Relying on our decision in *United States v. Reifsteck,* 535 F.2d 1030 (8th Cir. 1976), Kummer further argues that the government's conduct in setting up the reverse sting was so outrageous as to constitute a violation of his due process rights.[9] Specifically, he notes that we read *Hampton* as not foreclosing the argument that the government's over-zealous participation in the crime was so fundamentally unfair as to constitute entrapment as a matter of law. *Id.* at 1034. Kummer is correct in stating that the due process/outrageous conduct argument was not foreclosed by *Hampton.*[10] He fails, how-

---

7. Among the factors lower courts have looked to in determining whether a defendant was predisposed are: (1) whether the defendant readily responded to the inducement offered; (2) the circumstances surrounding the illegal conduct; (3) whether the defendant was engaged in an existing course of conduct similar to the crime for which he is charged; (4) the defendant's reputation; and (5) the conduct of the defendant during the negotiations with the undercover agent. *See United States v. Dion,* 762 F.2d 674, 687–88 (8th Cir.1985), *reversed on other grounds,* 476 U.S. 734, 106 S.Ct. 2216, 90 L.Ed.2d 767 (1986).

8. In determining whether there was a jury issue on the question of entrapment, we must review the evidence in the light most favorable to the government. *United States v. French,* 683 F.2d 1189, 1192 (8th Cir.), *cert. denied,* 459 U.S. 972, 103 S.Ct. 304, 74 L.Ed.2d 284 (1982).

9. We note that there is a distinction—one about which Kummer does not seem to be entirely clear—between the entrapment defense, whether raised as a matter of law or fact, and the argument that government conduct is so outrageous as to violate due process. While there is some overlap between the concepts underlying the two defenses, the defense of outrageous conduct is distinct from that of entrapment: the entrapment defense under federal law requires an inquiry into the defendant's predisposition to commit the crime with which he is charged, whereas the outrageous government conduct defense focuses on the conduct of the government. *See United States v. McCaghren,* 666 F.2d 1227, 1230 n. 5 (8th Cir.1981); *United States v. Quinn,* 543 F.2d 640, 647–48 (8th Cir.1976).

10. A plurality of the court in *Hampton* (Rehnquist, J., joined by Burger and White, JJ.) concluded that the outrageous conduct defense was not available to a defendant who was predisposed to commit the crime. 425 U.S. at 488–89, 96 S.Ct. at 1649–50. A majority of the court, however, agreed that a court, in its supervisory capacity or under due process principles, could conceivably bar a conviction of a predisposed defendant because of outrageous police conduct. *Id.* at 491–95, 96 S.Ct. at 1650–53 (Powell, J., concurring, joined by Blackmun, J.); *id* at 495–500, 96 S.Ct. at 1653–55 (Brennan, J., dissenting, joined by Stewart and Marshall, JJ.).

ever, to show that the government's participation in the reverse sting was sufficiently unpalatable to require a finding that his due process rights were violated.

In *Hampton,* a majority of the Supreme Court agreed that even where a defendant is predisposed to commit an offense, "outrageous police conduct" could conceivably bar the defendant's conviction based on due process principles.[11] 425 U.S. at 492–93, 96 S.Ct. at 1651–52 (Powell, J., concurring); *id.* at 499, 96 S.Ct. at 1654 (Brennan, J., dissenting). In a case we decided the same year in which *Hampton* was decided, we noted, however, that

> [g]ranting that a person is predisposed to commit an offense, we think that it may safely be said that investigative officers and agents may go a long way in concert with the individual in question without being deemed to have acted so outrageously as to violate due process....

*United States v. Quinn,* 543 F.2d 640, 648 (8th Cir.1976). Similarly, in *Gunderson v. Schlueter,* we found that the level of "outrageousness" needed to prove a due process violation is "quite high." 904 F.2d 407, 410 (8th Cir.1990). Whether law enforcement officers may go as far as *selling* drugs to a targeted individual (a reverse sting) is a question we recently addressed in *United States v. Huff,* in which we held that "[w]hen a defendant is predisposed to committing [a] crime ... a reverse sting will not ordinarily rise to the level of a due process violation." 959 F.2d 731, 734 (8th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992). The relevant facts here are not substantially different from those in *Huff.* We

therefore do not find that the police conduct in this case was so outrageous as to constitute a violation of Kummer's due process rights.

## II. Successive Prosecution

Kummer next raises three separate arguments that concern the common theme of his successive state-federal prosecutions. We address each individually.

### 1. Double Jeopardy.

■ Kummer first argues that Count Four of his indictment, charging him with possession of cocaine with intent to distribute, is a violation of the double jeopardy clause of the Fifth Amendment. Specifically, he argues that the federal government's reliance on criminal activity stemming from the state officers' sale of drugs that resulted in his conviction in state court is tantamount to being "prosecuted a second time for the same actions by the same people." Appellant's Br. at 20. His contention seems to be that since his charges arose out of an operation the state alone planned and executed, the state in effect had too great a hand in the defendant's ultimate federal prosecution (leaving the government with the minimalist role of deciding only whether to exercise its prosecutory discretion). *Id.* at 19.[12]

■ It is well-established that the "same acts" in a state proceeding may be the basis for a federal prosecution. *Abbate v. United States,* 359 U.S. 187, 193–96, 79 S.Ct. 666, 669–71, 3 L.Ed.2d 729 (1959). Under the doctrine of dual sovereignty, prosecution by both the state and federal authorities for the

11. Whether police conduct could rise to the level of a due process violation in entrapment cases was first raised in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), in which the Court recognized that there may be "situation[s] in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643 (citations omitted).

12. To support his argument, he relies on a footnote in *Abbate v. United States,* 359 U.S. 187, 200 n. 4, 79 S.Ct. 666, 673 n. 4, 3 L.Ed.2d 729 (1959), in which the Supreme Court indicated

that there may be situations where a state prosecution could preclude the federal government from enforcing federal law where there is federal participation in the state prosecution. He analogizes this to the present case (the reverse situation being at issue here, *e.g.,* state participation in a federal prosecution).

Kummer's reliance on *Abbate* might be appropriate but for the fact that there was no evidence of either federal participation in the state proceedings, or of state participation in the federal proceedings. Indeed, Kummer conceded at oral argument that the investigation of him was not a joint state-federal investigation, but rather a "state operation from the beginning."

same conduct does not violate the double jeopardy clause. *Id.; United States v. Simpkins,* 953 F.2d 443, 444 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 1988, 118 L.Ed.2d 585 (1992); *United States v. Woodard,* 927 F.2d 433, 435 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 246, 116 L.Ed.2d 201 (1991). Because only the same sovereignty is prohibited from prosecuting a person more than once for the same offense, we find that Kummer's Fifth Amendment rights under the double jeopardy clause were not violated. *Simpkins,* 953 F.2d at 444.

### 2. Res Judicata/Collateral Estoppel.

■ Kummer next maintains that his conviction should be barred under the doctrine of res judicata since his innocence was affirmed by the North Dakota Supreme Court. We reject this argument for the same reasons that we rejected Kummer's double jeopardy argument. The collateral estoppel and res judicata doctrines do not apply when different sovereigns and, thus, different parties are involved in criminal litigation. *See United States v. Brown,* 604 F.2d 557, 559 (8th Cir.1979); *Turley v. Wyrick,* 554 F.2d 840, 842 (8th Cir.1977), *cert. denied,* 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978).

### 3. *Petite* Policy.

■ Kummer lastly contends that the government violated its "self-induced proscription" against successive state-federal prosecutions under the Justice Department's *Petite* policy. Appellant's Br. at 22. Under the *Petite* policy, first recognized in *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960),

> United States Attorneys are forbidden to prosecute any person for allegedly criminal behavior if the alleged criminality was an ingredient of a previous state prosecution against that person. An exception is made only if the federal prosecution is specifically authorized in advance by the Department [of Justice] itself, upon a finding that

the prosecution will serve "*compelling interests* of federal law enforcement."

*Thompson v. United States,* 444 U.S. 248, 100 S.Ct. 512, 62 L.Ed.2d 457 (1980) (emphasis added).

Kummer argues that the government violated the *Petite* policy because it had no "compelling" federal interest in prosecuting him. The government does not identify the compelling interests it had for prosecuting Kummer, and we decline to venture a guess at what they may be given our court's refusal to speculate what interests or other administrative concerns the government may have for prosecuting a defendant under the *Petite* policy. *See United States v. Wallace,* 578 F.2d 735, 740 (8th Cir.1978). As a general matter, because the *Petite* policy is an internal administrative policy, we lack the power to review decisions by the Department of Justice to waive it. *Id.; United States v. Woodard,* 927 F.2d 433, 435 (8th Cir.1991). Moreover, although the *Petite* policy "serves the ... important purpose of protecting the citizen from any unfairness that is associated with successive prosecutions based on the same conduct," we have found that the policy does not generally confer substantive rights. *United States v. Bartlett,* 856 F.2d 1071, 1075 (8th Cir.1988) (quoting *Rinaldi v. United States,* 434 U.S. 22, 27–28, 98 S.Ct. 81, 84–85, 54 L.Ed.2d 207 (1977) (per curiam)). Thus, the policy cannot form the basis of a claim that the subsequent prosecution was improper. *Id.*

### III. *Violation of Rule 11*

■ Kummer next challenges the admissibility of oral statements he made to the police he alleges were made in the course of plea negotiations. Specifically, he claims that the inculpatory statements he made to the state authorities after his arrest were in the nature of plea negotiations, and therefore are inadmissible pursuant to Rule 11 of the North Dakota Rules of Criminal Procedure.[13] At the outset, we note that Rule 11 of the

---

**13.** Rule 11 provides in pertinent part:
  If a plea discussion does not result in a plea of guilty ... any statement made in connection with and relevant to the plea discussion or any resulting agreement, plea, or judgment is not

admissible in any criminal or civil action or administrative proceeding against the person who made the plea offer.
  N.D.R.Crim.P. 11(d)(6).

North Dakota Rules of Criminal Procedure is not applicable because Kummer's subsequent prosecution was brought in federal, not state, court.

Rule 11 of the Federal Rules of Criminal Procedure prohibits the admissibility of any statement made in the course of plea discussions with an attorney for the government. Fed.R.Crim.P. 11(e)(6). We extended the rule in *United States v. Grant,* 622 F.2d 308, 312–13 (8th Cir.1980), to situations where law enforcement officers enter into negotiations with *express* authority from a government attorney. Thus, we have held that statements made to law enforcement agents during the course of plea negotiations are inadmissible if the agents have been given express authority from a government attorney to enter into such negotiations. *Id.; see also United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).

The record is void of any evidence that Kummer's inculpatory statements to the officers were made in the course of plea negotiations, or that the officers had express authority from a government attorney to enter into such negotiations. The detectives' statements to the effect that they could "put in a good word" for Kummer can neither reasonably be construed to mean that their discussions with Kummer amounted to plea negotiations nor that they had express authority to enter into such negotiations. In *Lawrence,* we similarly held that promises made by police to inform the prosecuting authorities of a defendant's cooperation do not amount to plea negotiations. 952 F.2d at 1036.

### IV. Fruit of the Poisonous Tree

Finally, Kummer argues that all evidence obtained as a result of his unlawful arrest is "fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). He contends that because he was entrapped as a matter of law, his arrest was illegal; therefore, all evidence obtained as a result of his unlawful arrest is inadmissible. Because we believe that the record is clear that Kummer was not entrapped as a matter of law, we find this argument to be unpersuasive.

### CONCLUSION

For the foregoing reasons, we find that the district court did not commit error in denying Kummer's motions for dismissal and to suppress evidence. We therefore affirm the district court's judgment.

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

The North Dakota Supreme Court has decided that the very act with which Mr. Kummer was charged here resulted from the illegal activity of agents of the state, because their possession of contraband was contrary to law. *State v. Kummer,* 481 N.W.2d 437, 443 (N.D.1992). On this question of state law, of course, the Supreme Court of North Dakota has the final say, and we are unauthorized to deviate from its determination. That court went on to hold that the use of unlawfully obtained drugs to induce the commission of a crime was entrapment as a matter of law. This holding, as the court today correctly concludes, is not binding on the federal courts; and, moreover, our cases require the application of different (indeed, contrary) principles in deciding whether an entrapment defense has been made out. I agree that the jury was free to conclude that the defendant did not establish entrapment in this case.

What I am unable to accede to is the court's conclusion that "the government's participation in the reverse sting was [not] sufficiently unpalatable to require a finding that [defendant's] due process rights were violated." With respect, I disagree that the relevant facts here are not substantially different from those present in *United States v. Huff,* 959 F.2d 731 (8th Cir.1992) and other cases in which we have upheld so-called reverse stings. The distinguishing fact is that in none of those cases did it appear that the police operation was put in motion by acts that violated state law.

The court today evidently holds that it is not outrageous for sworn officers of the state to break the law. For me, official illegality must almost always be outrageous, for if the government will not obey the law, how can it

rightfully expect its citizens to feel an obligation to do so? It is true that the principle for which I am arguing will cause the result in a particular case to turn on the law of some relevant state, but there is nothing troubling about this. In federal takings cases, for instance, the question of whether a particular interest in a thing is "property" for fifth-amendment purposes is normally determined by reference to state law. *See United States ex rel. Tennessee Valley Authority v. Powelson,* 319 U.S. 266, 279, 63 S.Ct. 1047, 1054, 87 L.Ed. 1390 (1943). We have held, too, that an arrest by a state actor that is not authorized by state law is "a seizure contrary to the Fourth Amendment." *Cole v. Nebraska,* 997 F.2d 442, 444 (8th Cir.1993); *see also Bissonette v. Haig,* 800 F.2d 812, 816 (8th Cir.1986) *(en banc ), aff'd,* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988) *(per curiam ).* Similarly, in my view, the use of means not authorized by state law to induce a violation of law is outrageous conduct contrary to the fifth amendment.

Finally, I concede that there is no indication that federal officers acted in an outrageous fashion in this case, because the original operation was under the direction of state authorities. But I do not know of any analogues of the bona fide purchase doctrine that would somehow cleanse this sting of its equities. But for outrageous official conduct this prosecution could not have occurred. I can think of no reason for a federal court to pass over its illicit origins.