739 A.2d 12

**James SKRIVANEK III**

v.

**STATE of Maryland.**

**No. 146, Sept. Term, 1998.**

Court of Appeals of Maryland.

Oct. 12, 1999.

William G. Salmond, College Park, for Appellant.

Regina Hollins Lewis, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for appellee.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW *, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

This is an appeal from a drug conviction. The appellant contends that the trial court erred by submitting the case to the jury on lesser included, but not expressly charged, attempt offenses. The appellant also argues that the police violated due process by the manner in which they conducted the reverse sting operation leading to the appellant's arrest and that the court improperly admitted evidence of other crimes. For the reasons set forth below, we shall affirm.

Corporal Robert Shelley (Shelley) of the Maryland State Police was working in an undercover capacity with the Cecil County Narcotics Taskforce on August 17, 1997. At that time, Shelley told confidential informants to give prospective buyers of marijuana his pager number so that he could be contacted to conduct a controlled sale of the drugs. On August 18, 1997, Shelley's pager was activated with a telephone number with which Shelley was not familiar. Returning the page, Shelley spoke with a person who identified himself only as "James." James was the appellant, James Skrivanek III (Skrivanek).

The next day, August 19, Shelley telephoned Skrivanek at the same number. The two men agreed to meet to discuss the terms of a transaction. Approximately ten minutes later, Shelley and Skrivanek met at a bank in Perryville, Maryland. Shelley wore a body wire, and their discussion was recorded.

At the meeting, Skrivanek reiterated that "Steve told me that you might be able to help me find some weed." Skriva-

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court, but did not participate in the decision and adoption of this opinion.

nek and Shelley then discussed the price for the drugs and agreed upon $900 per pound, $1,350 for a pound and a half. Portions of the transcript of the recorded conversation are set forth below.

"Skrivanek: Uh, instead of dealing in a big amount at first, can [I] just go ahead get like uh half or a pound at a time until I get comfortable.

"Shelley: (Sigh) Man, I don't.

"Skrivanek: I could bring you mad business, but you know, if, I'm just as sketchy as you are right now.

"Shelley: I, I know that, but no. I, I, it ain't, it ain't worth the . . . risk.

"Skrivanek: Right.

. . . .

"Skrivanek: Can I get one the first time?

"Shelley: Yeah that's not a problem.

"Skrivanek: I got the money for, you know as much, but I'm just really nervous.

"Shelley: (Laughter)

"Skrivanek: You know it's just like we just met, you know?

"Shelley: Yeah. Yeah.

"Skrivanek: I'm probably just as scared as you are.

"Shelley: Well, OK. My problem is that you tell me one and a half.

"Skrivanek: Right.

"Shelley: Then you, then you want a lot less than that and now you want one.

"Skrivanek: Well I can, I can get one and a half that 's not a problem. Uh, I'm just nervous.

"Shelley: (Laughter) I, I, I bet you are.

"Skrivanek: I deal in LSD and it's got me sketchy, cause right now four of my friends in the area got busted by somebody I don't know who they are.

"Shelley: Well can you, can you?

"Skrivanek: I don't know.

"Shelley: See I, I can move some sheets. Whatcha talkin.

"Skrivanek: Uh, for a book probably twelve to a buck twenty a sheet."

There followed a discussion about a possible future course of dealing between the two men in which they would barter LSD and marijuana. In the conversation, Skrivanek gave a representation of the quality of his product, stating, "[i]t's got three hundred mic's on it ... [i]t's really good ... real clean." Skrivanek said: "In fact, if you've ever heard [of] Timothy Leary designs, that's what design they are, they're Timothy Leary's, they come from California." Each party indicated that he might be able to effect price reductions in future transactions.

The conversation then continued as follows:

"Shelley: Yeah. You said some friends of yours have been hurt lately.

"Skrivanek: Yeah. Which is scary, I was about to lock down.

"Shelley: Yeah.

"Skrivanek: Just say fuck it, you know. But um, I have people in White Marsh that are starving for herb. (Inaudible) that's where I work, I'm there all day long.

"Shelley: It's, it's, I've got a good supply, it's a never ending supply, so, and I can, I can go damn near as high as you can possibly imagine. Not [sic].

"Skrivanek: I don't need to know anything."

The parties agreed that Skrivanek would beep Shelley's pager the next day to make arrangements for the consummation of the sale of one and one-half pounds of marijuana.

On the next day, August 20, Skrivanek contacted Shelley by pager. Shelley called him back and was told that Skrivanek had to run an errand and would contact Shelley when he returned. Approximately one-half hour to an hour later, Skrivanek again paged Shelley. Skrivanek said that he would not be able to meet that day because his wife had not gone to the bank to withdraw money for the drugs. Skrivanek prom-

ised to obtain the money the next day and to page Shelley to make arrangements for purchasing the drugs.

Skrivanek again paged Shelley in the afternoon of August 21. He left a number consisting of the last six digits of Skrivanek's telephone number followed by 1400. This indicated to Shelley that Skrivanek was going to pay $1,400 for the drugs. When Shelley returned the page, Skrivanek confirmed that he had paged Shelley earlier and that he was going to pay him $1,400. The men agreed to meet in a half hour at an industrial plant in Perryville. After the half hour expired, Shelley was paged again. This time, Skrivanek left the number, 745 1400, which indicated to the officer that they should meet at 7:45 p.m.

The undercover officer arrived early, again wearing a body wire. When Skrivanek arrived, he parked his car so that their driver side windows faced and were within arm's reach of each other. Officer Shelley and Skrivanek exchanged the keys to their respective automobiles. Shelley then handed Skrivanek a brown paper bag in which he had placed roughly one and one-half pounds of marijuana. Shelley's supervisors in the Maryland State Police had authorized this quantity be released to him for the reverse sting operation from the drug locker of the Bureau of Drug and Criminal Enforcement Division. Skrivanek placed the bag containing marijuana in his lap, beyond the officer's view, peered into the bag, and said to Shelley that it "[l]ooks good." According to Officer Shelley, the defendant then "appeared to place it over on the passenger's seat or on the floor somewhere over there." Skrivanek gave Shelley a large sum of U.S. currency, which the officer began to count.

As Officer Shelley was counting, another state trooper arrived at the parking lot. Skrivanek was arrested. A grand jury indicted Skrivanek on charges of unlawful possession of a controlled dangerous substance with the intent to distribute under Maryland Code (1957, 1996 Repl.Vol.), Art. 27, § 286, and possession of a controlled dangerous substance under Art. 27, § 287.[1] Before the case was tried, the defendant filed a

---

1. Article 27, § 286, in pertinent part, reads:

motion *in limine* seeking to exclude, *inter alia,* "any reference to any CDS for which Defendant is not charged." The court denied Skrivanek's motion. The objection was renewed at trial.

Appellant was tried to a jury. At the close of the State's case the trial judge handed the parties copies of *Hagans v. State,* 316 Md. 429, 559 A.2d 792 (1989), and raised the possibility of instructing the jury on the lesser included offenses of attempt to possess marijuana with intent to distribute and attempted simple possession. The trial judge apparently did not believe that the State had proved that Skrivanek had gained actual possession of the marijuana as a matter of law.

"THE COURT: I think the state is going to have an awful tough time with this thing when you have a person almost in custody. However, you are probably entitled to a lesser included offense instruction. I mean the police did such a good job. I think you have a real tough time with dominion and control.

"[PROSECUTOR]: Under the law, as far as I understand the law, there's no set period of time a person has to have dominion and control.

"THE COURT: Shelley testified it was in his custody. You asked the question. He said the moment he got there, his words, he was in custody. I don't know how a person like that can actually exercise dominion and control. The one reason I brought that case [*Hagans* ] out, even if you

---

"(a) Except as authorized by this subheading, it is unlawful for any person:

"(1) To manufacture, distribute, or dispense, or to possess a controlled dangerous substance in sufficient quantity to reasonably indicate under all circumstances an intent to manufacture, distribute, or dispense, a controlled dangerous substance...."

Article 27, § 287, in pertinent part, reads:

"Except as authorized by this subheading, it is unlawful for any person:

"(a) To possess or administer to another any controlled dangerous substance, unless such substance was obtained directly, or pursuant to a valid prescription or order from a practitioner, while acting in the course of his professional practice."

don't charge a lesser included offense, you are entitled to an instruction, attempt to distribute.

"[PROSECUTOR]: With these cases *I am not going to object to the Court offering that to the jury.*"

(Emphasis added). Later, the court again asked the prosecutor if he would agree to an instruction regarding attempts.

"THE COURT: ... [A]re you going to want the attempt?

"[PROSECUTOR]: I guess if—depending how the Court rules, again, I would still.

"THE COURT: You want me to keep attempt alive?

"[PROSECUTOR]: *I would like to have the Court keep attempt alive.* I sense the Court is not ruling in my favor here."

(Emphasis added). The prosecutor continued to maintain that possession had been proven and to oppose the defendant's motion for judgment of acquittal. In the following passage, Skrivanek submitted that the court could not force the prosecutor to accept the lesser included attempt charges.

"[DEFENSE]: The other thing in *Hagans,* and it sounds to me like Your Honor is taking [the prosecutor], dragging him with his heels six inches into the ground.

"THE COURT: Well, he said if I was going to knock out the other charge—

"[PROSECUTOR]: We have no objection to the court—

"THE COURT: He didn't want to get knocked out.

"[PROSECUTOR]: We disagree—

"THE COURT: If I did it over his objection the case is going to go out the door. He made it clear.

"[DEFENSE]: Let the record though be clear that basically Your Honor produced the case, and that was the court's decision. It was not on request of the state.

"THE COURT: No. But its acquiesce—the state, they don't want me to knock out the other case. They still believe he had dominion and control. The Court of Appeals could rule that he did. If I thought that was the case I'd

have left it in; then we'd end up with the jury—there is no law on that, with the jury making that decision.

"[PROSECUTOR]: It is a factual issue.

"THE COURT: Well, it is, and it may very well be a legal issue. Does dominion and control apply.

"[PROSECUTOR]: I'd also ask Your Honor because of the circumstances that ... there be no comments during closing arguments regarding the changes in the charge. We just argue on the charge."

The court entered judgment for the defendant on the two possession charges, but sent the case to the jury on the lesser included charges. The jury convicted Skrivanek of attempted possession with intent to distribute. He was sentenced to five years, of which two were suspended.

Skrivanek appealed to the Court of Special Appeals. We issued the writ of certiorari on our own motion prior to consideration of the matter by the intermediate appellate court. Appellant's brief raises four issues which we have reordered. They are:

1. "Did the Court err in allowing the case to go forward on uncharged attempted charges after granting defendant's motion for judgment of acquittal on both indicted charges?"

2. "Can a defendant be convicted of an attempted unlawful possession of a controlled dangerous substance in sufficient quantity to reasonably indicate under the circumstances an intent to distribute where the actual possession of the contraband has not been established?"

3. "Did law enforcement's conduct in the reverse-sting undercover operation violate the principles of due process by being so outrageous and shocking that it exceeded the bounds of fundamental fairness to the appellant and should the Judge as a matter of law have dismissed or acquitted appellant of the attempted distribution charge because of this and the fact that appellant was not predisposed to distribute?"

4. "Did the Court improperly deny appellant's Motion in Limine to exclude statements made by the defendant to the

undercover officer on August 19, 1997 concerning lysergic acid?"

I

This Court has held, consistent with "virtually every jurisdiction in the United States which has passed upon the issue," that "a defendant, charged with a greater offense, can be convicted of an uncharged lesser included offense." *Hagans*, 316 Md. at 447, 559 A.2d at 800. We placed a number of restrictions on the operation of the rule, which are not relevant here, and noted a division among courts as to whether a trial court should, *sua sponte,* give a jury instruction on an uncharged, lesser included offense. *Id.* at 454, 559 A.2d at 804. On that issue we stated:

> "The better view, we believe, is that the trial court ordinarily should not give a jury an instruction on an uncharged lesser included offense where neither side requests *or affirmatively agrees* to such instruction. It is a matter of prosecution and defense strategy which is best left to the parties. ... When counsel for both sides consider it to be in the best interests of their clients not to have an instruction, the court should not override their judgment and instruct on the lesser included offense."

*Id.* at 455, 559 A.2d at 804 (emphasis added). In *Hagans,* the prosecutor had sought the instruction on the lesser included offense. "While the initial suggestion[ ] for submitting to the jur[y] the lesser included offense[ ] may have come from the trial judge[ ] ..., the prosecuting attorney[ ] ... argued for the submission[ ]." *Id.* at 455, 559 A.2d at 805. We affirmed Hagans's conviction on the uncharged, lesser included offense. *Id.*

Relying on the above-quoted passage from *Hagans,* Skrivanek argues that the trial judge should not have instructed the jury on attempted possession. According to the defendant, this is because the prosecutor repeatedly argued that the evidence showed a consummated and not an attempted crime,

and because the prosecutor did not affirmatively request the court to instruct on attempt.

It is clear that the prosecutor believed that the trial court took too restrictive a view of the law of possession and of the State's proof of Skrivanek's possession. Nevertheless, when faced with an apparently impending dismissal of the charged offenses, the State *affirmatively agreed* to the attempt instructions. The prosecutor not only stated that he was "not going to object to the Court offering [the attempt theory] to the jury," but he also affirmatively said that he "would like to have the Court keep attempt alive."

Like the trial judge in *Hagans,* the trial judge in the present case initiated the discussion of the lesser included offense instruction. That, under *Hagans,* is not determinative. A prosecutor may be said to "request or affirmatively agree to such an instruction" even though the judge initially raises the possibility of giving the instruction.

The rationale behind the holding in *Hagans* is that trial judges should not interfere with defense and prosecution strategies by deciding, *sua sponte,* to instruct on lesser included offenses. *Id.* at 455, 559 A.2d at 804. *See also Walker v. United States,* 418 F.2d 1116, 1119 (D.C.Cir.1969) ("In general the trial judge should withhold charging on lesser included offense[s] unless one of the parties requests it, since that charge is not inevitably required in our trials, but is an issue best resolved, in our adversary system, by permitting counsel to decide on tactics."); *State v. Dexter,* 954 S.W.2d 332, 344 (Mo.1997) ("When the failure to request a lesser-included instruction is a matter of strategy, the court should not second guess the defendant's counsel."); *State v. Gunderson,* 282 Mont. 183, 936 P.2d 804, 806 (1997) (holding that trial courts are not required to instruct, *sua sponte,* on lesser included offenses because " 'under our adversarial system of justice, the prosecution and defense must have the option of foregoing a lesser charge instruction for strategic reasons. Lawyers, not judges, should try cases.' "), *overruled on other grounds by State v. Montoya,* 983 P.2d 937, 1999 MT 180 (1999).

Here, the instructions given on the lesser included offenses *supported* the State's stated strategy. The prosecutor's adherence to the viability of the charges of actual possession did not reflect an "all or nothing" strategy in favor of those charges. Faced with the trial court's view that the State's case on the greater charged offenses was legally insufficient, and anticipating the grant of a motion for acquittal, the prosecutor enlarged his theory of the case and adopted a fall-back position. In other words, the State's modified strategy included the alternative of a lesser included offense instruction. Thus, the court's submission of the attempt instruction to the jury cannot be viewed as a decision by the trial judge acting without the affirmative agreement of at least one party.

■ Skrivanek argues that he was prejudiced by this change in the case in that he was required in mid-trial to research and prepare requested instructions on the law of attempts. There was no error. When this argument was presented to the trial court it offered Skrivanek a continuance. The defendant, however, declined the offer and elected to proceed.

■ The appellant argues further that "upon granting the defendant's motion for judgment of acquittal on the only charges in the indictment, the Court summarily acquitted and disposed of all charges, including any lesser uncharged offenses such as attempted crimes." In support of this argument, Skrivanek cites several opinions of this Court wherein we said that "[t]he crime of attempt is an adjunct crime, it cannot exist by itself, but only in connection with another crime." *Cox v. State*, 311 Md. 326, 330, 534 A.2d 1333, 1335 (1988); *Hardy v. State*, 301 Md. 124, 139, 482 A.2d 474, 482 (1984). What is meant by this statement is simply that the elements of attempt cannot be considered without considering the elements of the consummated crime. *See Hardy*, 301 Md. at 139, 482 A.2d at 482 ("The crime of attempt by definition expands and contracts and is redefined commensurate with the substantive offense.").

Courts in other jurisdictions have rejected Skrivanek's position, stating that a trial judge is permitted to grant judgment for the defendant on the "flagship" charge of an indictment and submit the case to the jury on an uncharged, lesser included offense. *Howard v. United States*, 237 F.2d 216, 217 (D.C.Cir.1956) (per curiam) (finding no error where trial judge granted judgment on first-degree murder charges, but instructed the jury on unindicted second-degree murder and manslaughter counts, and jury convicted defendant of manslaughter), *cert. denied*, 359 U.S. 917, 79 S.Ct. 595, 3 L.Ed.2d 579 (1959); *State v. Null*, 247 Neb. 192, 201, 526 N.W.2d 220, 228 (1995) ("[W]here the State fails to demonstrate a prima facie case on the crime charged, but does so on a lesser-included offense, the trial court in its discretion may direct a verdict on the crime charged and submit the evidence to the trier of fact for consideration on the lesser-included offense."); *State v. Morris*, 331 N.W.2d 48, 56 (N.D.1983) ("[E]ven if [the defendant's] motion for judgment of acquittal of the crime of possession with intent to deliver should have been granted, we still would find no reversible error on the trial court's part in submitting [the defendant's] case to the jury because [the defendant] was convicted of the lesser included offense of simple possession. . . ."). *Cf. State v. Strong*, 339 S.W.2d 759, 765 (Mo.1960) ("A defendant who has been convicted only of murder in the second degree may not successfully urge error in the giving of an instruction on murder in the first degree, even if the instruction is not sufficiently supported by evidence.").

The lesser included charge of attempted possession with intent to distribute was properly submitted to the jury.

## II

 Skrivanek's next argument seems to be that the intent to distribute, when shown by inference from the quantity of drugs possessed, must be based on an actual possession and that that element is lacking in the present case because the court granted Skrivanek's motion for acquittal on the charged offenses. As Skrivanek phrased the argument, "it

was necessary for the State to show that the appellant actually possessed or constructively possessed the cannabis in order to create an inference that appellant intended to distribute the drug." If this argument were correct, there could be no crime of attempt to possess with intent to distribute a large quantity of drugs; any attempt would, at the same time, amount to the completed crime. Such a result contradicts the holding in *Grill v. State*, 337 Md. 91, 94, 651 A.2d 856, 857 (1995), where this Court stated that the "[f]ailure to consummate the intended crime is not an essential element of an attempt." It is sufficient that "a defendant [has] a specific intent to commit a particular offense and ... perform[s] some overt act in furtherance of that intent that goes beyond mere preparation." *Id. Cf. United States v. Baker*, 985 F.2d 1248, 1257 (4th Cir.1993) (withdrawal of $100 from bank with the intent to purchase cocaine insufficient evidence of attempted possession with intent to distribute where evidence showed expensive cost of drug), *cert. denied, Blackwell v. United States*, 510 U.S. 1040, 114 S.Ct. 682, 126 L.Ed.2d 650 (1994).

Courts in other jurisdictions have held that actual possession is not a necessary element of the crime of attempt to possess CDS with the intent to distribute. *See United States v. Jones*, 102 F.3d 804, 808 (6th Cir.1996); *United States v. Rosalez–Cortez*, 19 F.3d 1210, 1217 (7th Cir.1994); *United States v. Mims*, 812 F.2d 1068, 1078 (8th Cir.1987). In *Jones* and *Rosalez–Cortez* the defendants had been negotiating to purchase substantial quantities of drugs from undercover agents who were posing as drug dealers. In each case the arrest was made before the defendants actually obtained possession of the drugs, the defendants were convicted of attempted possession with intent to distribute, and the appellate courts sustained the convictions against challenges to the sufficiency of the evidence. In *Jones* the arrest was made after the defendants showed the undercover agents four firearms which were to be bartered in partial exchange for the purported drugs, which had not yet been displayed to the defendants. *Jones*, 102 F.3d at 807. In *Rosalez–Cortez* the transaction took place on a large parking lot. After the

defendants had delivered $54,000 to the undercover agents the defendants drove with the agents in the agents' car to the defendants' car into which the defendants planned to move the purchased cocaine, which had not yet changed hands. *Rosalez-Cortez*, 19 F.3d at 1217.

In *Mims* one of the defendants, Einfeldt, was convicted of knowingly and intentionally using a communication facility to facilitate an attempt to possess heroin with intent to distribute, in violation of 21 U.S.C. § 843(b) and (c). The Government's case was made through taps of the telephone of one Sage, a drug dealer who was under surveillance. Sage terminated negotiations with Einfeldt before any contract was formed for the sale of drugs to Einfeldt. In affirming Einfeldt's conviction, the Eighth Circuit held that the substance of certain telephone conversations evidentiarily satisfied the attempt element of the federal offense. *Mims*, 812 F.2d at 1079.

## III

Skrivanek contends that the police violated his rights under the Due Process Clause and Article 24 of the Maryland Declaration of Rights. According to the appellant, the reverse sting operation and the methods of inducement used by Shelley exceeded the bounds of fundamental fairness, and, therefore, his conviction should be reversed.

■ The defense asserted by Skrivanek is not, strictly speaking, entrapment. That defense lies, in general, where there was an inducement on the part of the government officials for the accused to commit the offense and, if so, where the accused has not shown any predisposition to commit the offense. *See Grohman v. State*, 258 Md. 552, 557, 267 A.2d 193, 196 (1970), *cert. denied*, 401 U.S. 982, 91 S.Ct. 1204, 28 L.Ed.2d 334 (1971); *Sparks v. State*, 91 Md.App. 35, 70, 603 A.2d 1258, 1275, *cert. denied*, 327 Md. 524, 610 A.2d 797 (1992). Rather, Skrivanek relies on a concept that has been articulated by the United States Supreme Court, although never applied by it. In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Court rejected an

entrapment defense where an undercover agent, purportedly in return for one-half of the defendant's production of methamphetamine, supplied the defendant with an essential, but not controlled, chemical for the manufacturing. In that context the Court said: "While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctively not of that breed." *Id.* at 431–32, 93 S.Ct. at 1643, 36 L.Ed.2d at 373 (citation omitted).

Skrivanek also cites us to *United States v. Huff,* 959 F.2d 731 (8th Cir.), *cert. denied,* 506 U.S. 855, 113 S.Ct. 162, 121 L.Ed.2d 110 (1992), an appeal from convictions for, *inter alia,* attempted possession of cocaine. Referring to *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the *Huff* court observed that "[a] majority of Justices agreed in *Hampton* that even where the defendant is predisposed to commit an offense, 'outrageous police conduct' could conceivably bar the defendant's conviction based on due process principles." 959 F.2d at 734. The *Huff* court further said that "[w]hen the defendant is predisposed to committing the crime, however, a reverse sting will not ordinarily rise to the level of a due process violation." *Id.*

Courts in almost every jurisdiction have approved of "reverse sting operations," stating that such conduct is not so outrageous as to bar a conviction for a narcotics offense on due process grounds. *See United States v. Pipes,* 87 F.3d 840, 843 (6th Cir.), *cert. denied,* 519 U.S. 966, 117 S.Ct. 391, 136 L.Ed.2d 307 (1996); *United States v. Chavis,* 880 F.2d 788, 793 (4th Cir.1989); *see also* D.R. Veilleux, Annotation, *Actions by State Official Involving Defendant as Constituting "Outrageous" Conduct Violating Due Process Guarantees,* 18 A.L.R.5th 1, 49–68 (1994) (citing cases where State-sanctioned "reverse sting operations" were held not to violate due process).

Skrivanek claims that Shelley insisted that Skrivanek purchase one and one-half pounds, rather than one-half of a pound, of marijuana, and that this constituted unconstitutional overreaching. The argument fails on factual and legal grounds.

There was sufficient evidence from which the jury could conclude that Skrivanek intended to purchase marijuana with the intent to distribute it. Despite his later, and momentary, second thoughts, Skrivanek originally informed Shelley that he sought one and one-half pounds of marijuana. The jury could have inferred from this evidence that, from the beginning, Skrivanek intended to distribute drugs. Further, after complaining that some of his friends encountered trouble while dealing drugs, Skrivanek justified his decision nevertheless to go ahead with the purchase of one and one-half pounds by stating, "I have people in White Marsh that are starving for herb." He also suggested to Shelley that the two "could meet maybe once a month the same way" to engage in drug transactions. This evidence belies the contention that the State agent induced Skrivanek to purchase more than one-half pound of marijuana.

In any event, even if Shelley in some way was the efficient cause of Skrivanek's purchasing one and one-half pounds of marijuana instead of one-half pound, that conduct would not violate due process, as illustrated by the cases reviewed below.

In *United States v. Cannon,* 88 F.3d 1495 (8th Cir.1996), the police had engaged in a reverse sting operation involving the sale of firearms to the defendants. Instead of providing only those firearms that the defendant had requested, the federal officials, acting undercover, had offered "a selection of firearms other than the type Defendants had requested." *Id.* at 1507. In determining that the officials' conduct was not so outrageous as to trigger due process protections, the court held that "the officers were permitted to test the limits of the Defendants' willingness to acquire firearms illegally in general and were not limited just to filling the customers' order." *Id.*

In *United States v. Mosley,* 965 F.2d 906 (10th Cir.1992), the defendant appealed his conviction for possession of CDS with the intent to distribute. According to the defendant, an undercover federal agent coerced him into buying cocaine instead of marijuana and into buying eight instead of four ounces of cocaine. This "ratcheted up" the severity of the transaction "for purposes of sentencing, and possibly for the purpose of selling [the defendant] an amount that would indicate intent to distribute as opposed to mere personal use." *Id.* at 914. Although the court stated that it did not condone the agent's tactics, it held that such conduct was not sufficiently coercive to sustain an outrageous conduct defense. *Id.*

An appellate court in Illinois came to a similar conclusion in *People v. Lawrence,* 208 Ill.App.3d 292, 153 Ill.Dec. 28, 566 N.E.2d 878 (1991). There, the defendant claimed that the police engaged in outrageous conduct by "select[ing] a specific amount of cocaine for a controlled sale and thereby determin[ing] the degree of felony and the mandatory minimum penalty." 153 Ill.Dec. 28, 566 N.E.2d at 881. The court rejected the defendant's argument, noting several facts. First, the police had not initially targeted the defendant for an investigation, rather they kept " 'tripping over the defendant' " in their investigation of another individual. In addition, a police officer testified that the amount specified by the police "was the amount of cocaine [the police] had available to it in the type of packaging which would generally be considered a higher-quality cocaine." *Id.*

Skrivanek has not cited us to any case where the defendant's conviction was reversed on due process grounds due, in part, to a police department's "ratcheting up" the offense committed by the defendant. Our research has disclosed one such case, *People v. Isaacson,* 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d 78 (1978). There, the Court of Appeals applied the New York constitution's due process clause in a case in which "the police wanted a conviction and simply set two specifications—a large amount of the substance to denote a high grade of crime and a situs of sale in New York." *Id.* at

720, 406 N.Y.S.2d 714, 378 N.E.2d at 84. Among the factors relied upon by the court were the following:

- The informant was a drug user and small time dealer who had been beaten by the police during his post-arrest interrogation. "While this harm was visited upon a third party," the court said that "it cannot be overlooked, for to do so would be to accept police brutality as long as it was not pointed directly at defendant himself." *Id.*

- The police obtained the informant's aid after telling him that he faced fifteen years to life when the police knew that the substance in capsules found on the informant was uncontrolled, but the informant was not told of this fact until the defendant's trial. *Id.* at 716, 378 N.E.2d at 80.

- The informant telephoned as many people as he could think of who might sell him drugs. One of these persons, the defendant, a graduate student at Penn State University, had sold the informant a small amount of drugs on two occasions some years before. *Id.* at 715, 378 N.E.2d at 79.

- The informant invoked his past friendship with the defendant and represented that he needed drugs for resale to raise money for counsel fees in an effort to avoid life imprisonment. *Id.* at 716, 378 N.E.2d at 80.

- At the instruction of the police the informant requested two ounces of cocaine. *Id.*

- The woman with whom the defendant was living actually obtained the cocaine. *Id.*

- The informant knew that the defendant did not want to enter New York with the drugs, but, by a series of changes in the planned delivery site, the informant, to satisfy his police controller, lured the defendant to a place just within New York and situated before the first visible road sign that a traveler from Pennsylvania

would encounter advising that the border had been crossed. *Id.* at 717, 378 N.E.2d at 80–81.

- The defendant was sentenced to fifteen years to life. *Id.* at 715, 378 N.E.2d at 79.

Two judges of the New York court dissented.

To decide this case we need not express agreement or disagreement with the holding in *Isaacson.* It is sufficient to note that the police misconduct in *Isaacson* is exponentially more gross than anything that Skrivanek claims was done by the police in the present matter.

## IV

Lastly, Skrivanek submits that the trial court erred in denying his motion *in limine,* which sought to exclude, as other crimes evidence, his statements regarding his dealing in LSD. The state claims that the statements were offered to prove Skrivanek's intent to distribute marijuana and his predisposition to obtain marijuana in a distribution-size quantity.

In order for other crimes evidence to be admissible, it must pass a three-step test. *Whittlesey v. State,* 340 Md. 30, 665 A.2d 223 (1995), *cert. denied,* 516 U.S. 1148, 116 S.Ct. 1021, 134 L.Ed.2d 100 (1996). First, the evidence must be " 'relevant to the offense charged on some basis other than mere propensity to commit crime.' " *Id.* at 59, 665 A.2d at 237 (quoting *Harris v. State,* 324 Md. 490, 496, 597 A.2d 956, 960 (1991)). Second, there must be "clear and convincing evidence that the defendant participated in the alleged acts." *Id.* Finally, "the court must determine that the probative value of the evidence substantially outweighs its potential for unfair prejudice." *Id.; see also* Maryland Rule 5–404(b).

Skrivanek's statements regarding LSD had special relevance on two grounds, namely, to prove the intent to distribute and to counter the due process defense. At trial, Skrivanek sought to negate any intent to distribute, introducing evidence concerning his employment, his domestic life, and his lifestyle in an effort to demonstrate that he was not a drug

dealer. He argued to the jury that the quantity of marijuana was not conclusive and that the one and one-half pounds could well have been for personal consumption over an extended period of time. That Skrivanek was contemporaneously dealing in LSD and that he was willing to engage in a course of dealing in the future under which he would barter LSD for marijuana are facts highly probative of an intent to distribute marijuana. Because Skrivanek's dealing in LSD was ongoing at the time as of which his intent to distribute marijuana was to be determined, this case is distinguishable from cases in which a conviction for distribution at some time considerably in the past is sought to be introduced by the State as evidence of current intent. *Cf. Harris v. State*, 324 Md. 490, 501, 597 A.2d 956, 962 (Two prior convictions, entered two and one-half years earlier than relevant time, held inadmissable); *Ross v. State*, 276 Md. 664, 671, 350 A.2d 680, 685 (1976) (informant's testimony that "accused had previously sold narcotics perhaps as long as 15 years before the crime charged in the indictment" held inadmissable). In the case before us, the recorded statement is evidence that Skrivanek was expanding his product line.

The portions of the recorded conversation between Skrivanek and Shelley concerning LSD also have special relevance to the due process defense. Skrivanek argues that the motion *in limine* should have been granted because he advised the trial court that he would not assert an entrapment defense. But the motion was denied, and the jury was instructed on entrapment. Further, whether one views the defense as entrapment or a due process violation, predisposition is relevant. As we pointed out above, "[w]hen the defendant is predisposed to committing the crime ... a reverse sting will not ordinarily rise to the level of a due process violation." *Huff*, 959 F.2d at 734.

The proof of the bad acts meets the standard of clear and convincing evidence. The evidence was Skrivanek's own voluntary, non-custodial, recorded statement. The extent to which the evidence might present Skrivanek as a person of bad character who was acting in conformity with that bad

character at the time of the alleged offenses is *de minimis* when compared to the probative value of the recorded statement. Indeed, particularly in view of the interrelated portion of the conversation in which the parties explore bartering, the references to Skrivanek's dealings in LSD are not unfairly prejudicial.

*JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.*